**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **TODD M. HOUSTON** : | |
| : | Civ. No. 2:11-4810 (KM) |
| **Plaintiff,** : | |
| : | |
| **v.** : | **OPINION** |
| : | |
| **TOWNSHIP OF RANDOLPH,** *et al.,* : | |
| : | |
| **Defendants.** : | |
| : | |

**KEVIN MCNULTY, U.S.D.J.:**

Todd M. Houston, a disabled volunteer firefighter, brings this action against the Township of Randolph, the Township of Randolph Volunteer Fire Department ("RVFD" or the "Department"), and RVFD's Chief, John McAndrew ("Chief McAndrew"). Houston alleges violations of his Free Speech, Due Process, and Equal Protection rights, the New Jersey Conscientious Employee Protection Act ("CEPA"), and the Americans with Disabilities Act (the "ADA"). He also alleges conspiracy to deprive him of his civil rights under 42 U.S.C. § 1985, and neglect or refusal to prevent the § 1985 conspiracy pursuant to 42 U.S.C. § 1986. All of these causes of action seek damages. This matter comes before the court on Defendants' motion for summary judgment pursuant to Rule 56, Fed. R. Civ. P.

Because Houston alleges claims under the United States Constitution and federal statutes, jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1343(a). Supplemental jurisdiction over his state constitutional and statutory claims is permissible pursuant to 28 U.S.C. § 1367(a), because they are so related to his federal claims as to form part of the same case or controversy under Article III of the United States Constitution. Venue in this District is proper under 28 U.S.C. § 1391 because the events underlying Houston's claims occurred in New Jersey. This matter is decided without oral argument, pursuant to Fed. R. Civ. P. 78.

Citing policy disagreements with RVFD relating to the deployment of the Rapid Intervention Crew ("RIC"), Houston wrote a letter to Chief McAndrew in

1

which he stepped down as a trainer for the RIC. Chief McAndrew responded by accepting Houston's resignation, stating that Houston should no longer conduct any training sessions, and suggesting that Houston take a break from the RVFD. Houston, however, remained a member of the Department. Houston now contends that this was not an acceptance of his resignation, but a "pretextual suspension" in retaliation for his speaking out about what he viewed as RVFD's violation of its own policies. In addition, Houston believes that, by prohibiting him from participating in training sessions, RVFD is illegally refusing to make a reasonable accommodation to his physical disability. Houston also alleges that RVFD withheld certain participation incentive payments as retaliation for his voicing disagreement with RVFD's policies.

One factual weakness common to Houston's retaliation claims is that, as a result of his disagreement with Chief McAndrew over RIC policies, Houston resigned as a RIC trainer. Chief McAndrew did no more than accept Houston's resignation when he prohibited Houston from participating in any further training sessions. True, McAndrew suggested a cooling-off period. Houston, however, was not expelled from the RVFD; he remained a member of the Department. He continued to qualify for LOSAP points and any other benefits. In addition, Houston also received all of the incentive payments to which he was entitled, and he did not properly appeal the denials of which he now complains.

Factual weaknesses aside, Houston's claims are seriously flawed as a matter of law, for the reasons stated herein. I find that McAndrew's response to Houston's resignation letter did not violate Houston's constitutional or statutory rights. Defendants' motion for summary judgment is granted.

## I.    BACKGROUND

Most of the essential facts underlying this suit are not disputed, even under a liberal interpretation of the procedural rules governing summary judgment.[1]

---

[1] Plaintiff's papers in opposition to the summary judgment motion were originally due on November 19, 2012. Houston did not file anything or request an extension. On December 4, 2012, cognizant of the impending January 23, 2013, trial date, the Court issued an Order to Show Cause requiring Houston to file opposition papers by December 21, 2012, and warning that further extensions would not be granted except under unusual circumstances. On December 20, 2012, Houston's counsel requested an extension on consent until January 7, 2013. The Court granted

## A.    The Randolph Volunteer Fire Department and the RIC

RVFD is a fully volunteer fire department consisting of four companies, each of which is led by a Battalion Chief. (John McAndrew Aff. ¶¶ 2-3 [ECF No. 32-2]). The Department as a whole is overseen by a Chief and Deputy Chief. (*Id.* at ¶ 4). Since 2011, John McAndrew has served as the Chief of the RVFD. (*Id.* at ¶ 1).

A Rapid Intervention Crew, or RIC, is a group of firefighters that reports to a structural fire to assist and rescue firefighters who become lost, injured, or trapped. (*Id.* at ¶ 5). RVFD set up a RIC, sometimes also called a Rapid Intervention Team ("RIT") or Firefighter Assist and Search Team, in either 1986 or 1996.[2]

The RIC does not confine its activities to the Township of Randolph, but also responds to fires in other jurisdictions in Morris County. (John McAndrew Dep. at 59:8-12, Ex. J to Harrison Aff. [ECF No. 32-8]). The fire scene's Incident Commander (the "IC") in the Authority Having Jurisdiction (the "AHJ") will contact a neighboring department, such as RVFD, via an electronic page seeking available RIC members. (John McAndrew Aff. ¶ 23). Once the chief of the responding department ascertains the number of available RIC-trained firefighters, he lets the IC know what resources are available. (*Id.* ¶ 24). The IC will then decide whether to summon the RIC members or to keep them on standby. (*Id.* ¶ 25).

---

that request, but still no opposition papers were filed. At a pretrial conference on February 14, 2013, Houston's counsel stated that he had misunderstood the deadline (which he had requested), and blamed his office personnel for the misunderstanding. The Court warned Houston's counsel that the Township had raised substantial issues in its summary judgment motion, that an opposition would be advisable, and that the Court was poised to rule on the papers even if such an opposition were not received. Houston's counsel requested, and the Court granted, yet another extension of time to file opposition papers, this time until February 21, 2013. On that date, Houston's counsel submitted a brief and a certification executed by Houston, but he did not submit anything in response to the Township's Statement of Material Facts. *See* L. Civ. R. 56.1 In such circumstances, the movant's Statement of Material Facts may be deemed undisputed, provided the court finds proper evidentiary support in the record. *See* L. Civ. R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion"). I have nevertheless combed Houston's Opposition and Certification, the Pretrial Order, and other documents of record for indications of factual support for Houston's position.

[2] Chief McAndrew stated 1986 in his affidavit, but 1996 at his deposition. (*Id.* at ¶ 6; John McAndrew Dep. at 45:12-18). The difference is immaterial.

A RIC may deploy to the fire scene as a whole team – that is, all of the RIC members, who come from the same fire department, may assemble at the firehouse, and only then go to the fire scene. Alternatively, partial RIC units from different departments may combine at the fire scene to form a RIC. (*Id.* ¶ 53). The former, whole-team method, in Houston's estimation, prioritizes the safety of the RIC members because they have trained together and have experience working together. The latter, partial-team method prioritizes speed by dispatching RIC members to the fire as soon as they are available.[3] (Houston Dep. at 109:7-109:23, 114:6-116:8; John McAndrew Aff. ¶¶ 53-54). The practice of Morris County fire departments has been to defer to the judgment of the IC about which method to follow. (*Id.* ¶¶ 49-51). The Morris County RIC Best Practices Guidelines (the "Guidelines"), which RVFD adopted in February 2011, do not require that a RIC be composed of firefighters from the same department. (Ex. C to Harrison Aff. [ECF No. 32-7]; John McAndrew Aff. ¶ 21). In any case, the Guidelines contain an "Important Notice" that "[a]nyone using this document should rely on his or her own independent judgment or, as appropriate, seek advice." (Guidelines at 2).

### B.   Houston's Work as a Firefighter

Houston originally served as a full-time firefighter for North Hudson Regional Fire & Rescue. On that job, he was injured, and his foot is now fused at a 90 degree angle. (Houston Dep. 9:6-11, 59:1-62:4, Ex. I to Harrison Aff. [ECF Nos. 32-7, 32-8]). He retired from North Hudson with a permanent disability. (*Id.*).

Around March 2001, Houston began to volunteer for the RVFD. (*Id.* at 15:18-16:6). He is a member of Company #2. (July 12, 2011 Letter from John McAndrew to Ted Carman, Ex. G to Harrison Aff. [ECF No. 32-7]). Houston's Battalion Chief since 2010 has been Ted Carman. (Houston Dep. at 97:18-22).

As a volunteer, Houston does not receive wages, expense accounts, health benefits, disability benefits, or any other standard compensation or benefits. (Final Pretrial Order at 6 [ECF No. 34]). If he participates in a certain number of activities, he is eligible to receive modest incentive payments, described in Section I.C, *infra*. He has stated that he is also eligible for free family memberships in the local YMCA and tuition assistance for certain classes at a community college. (*Id.* at 6-7).

---

[3] Under the whole-team option, by contrast, if a whole crew is not available, the RIC would not deploy at all.

4

Houston and RVFD's then-Chief, William Wagner, reached an agreement as to what Houston's role would be in the RVFD in light of the limitations imposed by his injury. (Houston-RVFD Agreement, Ex. B to Harrison Aff. [ECF No. 32-7]). Their agreement, although dated May 10, 2010, indicates that the terms had been worked out earlier that year. (*Id.*). It provides that Houston would remain as RIC Team Captain;[4] in this role, he would train firefighters and otherwise administer the RIC. (*Id.*). He would also respond to RIC calls when possible, reporting at the scene to the Incident Command Post and acting as liaison to the Department's RIC. (*Id.*). Because Houston could no longer drive RVFD vehicles or work as an active interior firefighter, he could not go into the "hot zone." (*Id.*). The agreement provides that it is to be reviewed annually. (*Id.*).

## C.   The LOSAP Program

The Emergency Services Volunteer Length of Service Award Program Act, which established the Length of Service Award Program ("LOSAP"), became effective in 1998. (Ex. M to Harrison Aff. at 1 [ECF No. 32-9]). LOSAP is a voluntary, municipally-funded, deferred-compensation program for volunteer emergency services personnel. (*Id.*; Thomas McAndrew Aff. ¶¶ 2, 15 [ECF No. 32-3]). A sponsoring agency, such as RVFD, establishes the local LOSAP and sets the yearly eligibility requirements. (Ex. M to Harrison Aff. at 1 [ECF No. 32-5]).

In the RVFD, to be eligible for LOSAP benefits in a particular year, the firefighter must amass a certain number of LOSAP Points, comprising Activity Points and Length of Service Points. (Thomas McAndrew Aff. ¶ 4 [ECF No. 32-3]). Participants earn Activity Points by, for example, attending meetings and training sessions, serving in leadership roles, or sitting on committees.[5] (*Id.* ¶ 6; Ex. O to the Harrison Aff. at 1 [ECF No. 32-10]). Length of Service Points are based on the number of active years a firefighter has served and are distributed as follows: seven per year for the first fifteen years, and three per year for each subsequent year. (Ex. O to the Harrison Aff. at 1).

---

[4] At a meeting in January 2011, Houston announced that he would no longer serve as RIC Captain, and a new RIC Captain was elected. (John McAndrew Aff. ¶¶ 14-15). Houston, however, continued to train RIC members.

[5] The Township's LOSAP ordinance and RVFD bylaws detail the point system and qualifying activities. (*See* Ex. O to the Harrison Aff. at 1; Ex. K to the Harrison Aff. at 24).

Firefighters with less than 15 years of service must earn at least 105 Activity Points to be eligible for a payment; those with 15 or more years need only 60 Activity Points. (Thomas McAndrew Aff. ¶ 9). If a firefighter meets a certain point threshold, thereby becoming eligible,[6] RVFD will make a one-time deposit into the firefighter's deferred income account. (Thomas McAndrew Aff. ¶ 5). The maximum available benefit payments are gradated by category, and the categories depend on the total number of points earned.

| Category | Total Points | Maximum Payment[7] |
|:---:|:---:|:---:|
| I | 104 or less | 0 |
| II | 105 to 149 | $233.00 |
| III | 150 to 204 | $815.00 |
| IV | 205 or more | $1339.00 |

(Source: *id.* ¶¶ 10-12).

---

[6] If a firefighter with less than 15 years of service earns 105 Activity Points, even without counting his or her longevity points, the firefighter would fall in Category II. A firefighter with 15 years or more of service who earns 60 Activity Points will have enough Longevity Points to at least fall in Category III.

[7] These are the maximum contribution amounts set for base year 2005, subject to statutory CPI increases for subsequent years. (Ordinance No. 18-06, adopted by the Township on August 3, 2006, Ex. O to the Harrison Aff.)

6

Houston's LOSAP results for 2008-11 are below. Because he had fewer than 15 years of service, he could only receive a LOSAP payment if he earned at least 105 Activity Points:

| Year | Activity Points | Longevity Points | Total Points | Category (eligibility) |
|------|-----------------|------------------|--------------|------------------------|
| 2008 | 135 | 35 | 170 | Category III |
| 2009 | 93 | 42 | 135 | Not eligible |
| 2010 | 91 | 42 | 133 | Not eligible |
| 2011 | 135 | 42 | 180 | Category III |

(Source: Thomas McAndrew Aff., Exs. 1-4).[8]

The procedure for making a LOSAP eligibility determination is as follows. RVFD's Secretary of Accounts, currently Thomas McAndrew, maintains the Department's LOSAP records. (Thomas McAndrew Aff. ¶ 1). At the end of the year, the Secretary creates and submits to the Chief an "Individual Year-End Report" that states the number of LOSAP points earned by each firefighter that calendar year. (*Id.* ¶ 13). The Chief then mails each firefighter a Year-End Report.[9] (*Id.*). The firefighter has 30 days to sign and return it, and can either accept or challenge the calculation. (*Id.* ¶ 14). If he or she accepts it, the Department will notify the Township's Chief Financial Officer and Risk Manager of the firefighter's benefit category. (*Id.*). The firefighter will then receive the appropriate contribution amount for his or her category. (*Id.*). A challenge to the category determination is deemed an appeal of the decision as long as it is in writing, as required by RVFD's By-Laws and the New Jersey Department of Community Affairs' LOSAP Rules. (*Id.* ¶¶ 14, 21; Ex. K to Harrison Aff. at 24 [ECF No. 32-9]; Ex. N to Harrison Aff. at 3 [ECF No. 32-10]). Upon receiving the written appeal, Secretary McAndrew will then meet with the firefighter to determine whether a point adjustment is appropriate. (Thomas

---

[8] For some reason, Houston's LOSAP summaries for 2009, 2010, and 2011 each list him as having six years of service. Assuming that is a mistake, changing it to seven for 2010 and eight for 2011 would not affect Houston's eligibility category because, for 2010, he still accrued too few Activity Points to be eligible, and, for 2011, he would have 194 points, leaving him in Category III.

[9] In 2010, the RVFD stopped printing Individual Year-End Reports for firefighters who did not qualify for a LOSAP contribution. (*Id.* ¶ 18). Such firefighters were nevertheless notified of their LOSAP point totals through their Battalion Chiefs. (*Id.* ¶ 19).

McAndrew Aff. ¶ 14). If a firefighter does not sign and return the Year-End Report, he or she may be deemed to have elected not to participate in LOSAP for that year. (*Id.* ¶ 15).

The Department did not receive any written appeal from Houston regarding the 2008, 2009 or 2010 determinations. (Thomas McAndrew Aff. ¶¶ 17, 21). For 2011, Houston (and apparently four other firefighters) did not sign their Year-End Reports, but RVFD awarded them LOSAP benefits anyway. (Lovell Aff. ¶ 6 and Ex. 3 [ECF No. 32-4]).

### D.   Houston's Disagreement with RIC Practices Culminates in His Resignation

Houston holds strong views of how the RIC should function. When RIC policies conflicted with his understanding of best practices, he communicated his disagreement to Chief McAndrew and other firefighters. (Houston Dep. at 114:6-116:2; 50:6-51:25; 93:2-97:3; 102:11-105:5; 106:2-19; 210:3-6; John McAndrew Aff. ¶¶ 37-39, 40-44, 47-49; 51-53, 56). These disagreements centered on policies relating to RIC deployment, destruction of property when the RIC was at the scene of a fire, and RIC training. (*Id.*).

#### 1.   RIC Deployment Policy

Houston believed that the Guidelines required that an RIC could (and should) deploy to a fire only if and when an entire team had assembled. In his view, a RIC whose members have previously trained together is a safer RIC. (Houston Dep. at 40:13-16, 50:21-51:16; 93:2-11). Lacking a quorum, then, the Department should send no assistance to the IC. Chief McAndrew believed that Houston's favored approach might fatally impair the functions of the RIC, which must deploy quickly. (*Id.* ¶ 49). Chief McAndrew interpreted the Guidelines to allow, if the IC requested it, for a partial RIC team to be deployed to the scene of a fire, where they could be combined with members from other fire departments to form a whole RIC. (John McAndrew Aff. ¶ 53). McAndrew's preferred approach dovetailed with the practice of the mutual aid agencies of Morris County: to defer to the judgment of the IC as to the deployment of RIC resources. (*Id.* ¶ 50).

RVFD's deployment of a partial RIC led to Houston's voicing his disagreement with the Department's policy in three instances: one at the end of

2010, the second a few months later, and the third in early July 2011.[10] (Houston Dep. 50:6-51:16; 93:2-11). After each of the first two deployments, Houston expressed his concern to Chief McAndrew that the Department was sending out understaffed RICs. (*Id.*). After the July 2011 deployment, Houston sent Chief McAndrew a letter resigning from his service as a RIC trainer, as described in Section I.D.3, *infra*.

Houston expressed his disagreement to others aside from Chief McAndrew, including RVFD firefighters, firefighters in other departments, neighbors, and family members. (*Id.* at 94:21-95:4). Houston directly spoke to about fifteen to twenty members of his company, and the whole company knew his views. (*Id.* at 95:15-96:8). Chief McAndrew believed that this threatened the cohesiveness of the RVFD. (John McAndrew Aff. ¶¶ 51, 57-58).

### 2. Other RIC-Related Policy Disagreements

Houston's views of proper RIC policies also diverged from those of Chief McAndrew regarding the procedure for certain RIC drills, the destruction of property at fire sites, and Houston's presentation style in training sessions.

On May 26, 2011, the RIC was scheduled to conduct a drill in a condemned structure. (John McAndrew Aff. ¶ 40). Specifically, Chief McAndrew wanted RIC personnel to practice maintaining communication with the potentially trapped firefighters they were assigned to aid. (*Id.* ¶ 41). Houston believed that a "hands-on" drill, *i.e.,* a physical simulation of rescuing trapped firefighters involving destruction of the property, was more appropriate. (*Id.* ¶¶ 42-43; Houston Dep. at 98:22-102:2). Houston shared this opinion with Chief McAndrew and Deputy Chief Dunn. Voices were raised, and the RIC Captain, John Pedrick, was upset. (John McAndrew Aff. ¶¶ 42-43; Houston Dep. at 102:17-104:20). In that conversation, Houston was defiant and insubordinate to Chief McAndrew. (John McAndrew Aff. ¶ 41). Chief McAndrew explained that while he understood Houston's view, he had decided that the drill should focus on communication. (*Id.* ¶ 43). The situation was resolved by a compromise in which everyone agreed to a hands-on drill with a communications component. (Houston Dep. at 106:2-106:19). Houston was satisfied with that outcome. (*Id.* at 106:20-22).

---

[10] Houston's opposition brief indicates that Chief McAndrew deployed RVFD members "who were not RIC trained." (Houston Opp. at 3). The relevant excerpts of Houston's deposition indicate only that partial RICs were sent to the scene of a fire, not that the individuals lacked training.

During the same discussion, Chief McAndrew and Houston talked about the protocol for a RIC's destruction of property at the scene of a fire. Chief McAndrew's policy (and the custom of the mutual aid departments of Morris County) is that RIC members should not destroy property unless the IC authorizes it. (John McAndrew Aff. ¶ 37). Houston, by contrast, believed that RIC members should have discretion to destroy property. (*Id.* ¶ 38). The conversation did not change Houston's mind, and he did not indicate that he would instruct his RIC trainees to follow the policy favored by Chief McAndrew. (*Id.* ¶¶ 45-46). Chief McAndrew regarded this as defiance, and was concerned that Houston would not teach his preferred protocol to RIC trainees. (*Id.* ¶¶ 45-46).

In the same conversation, Chief McAndrew spoke with Houston about Houston's RIC training methods. (*Id.* ¶ 47). On several occasions, Chief McAndrew observed Houston leading training sessions. (*Id.* ¶ 34). Chief McAndrew found that Houston delivered these lessons in an overly aggressive and dramatic manner. (*Id.* ¶¶ 34-35). Consequently, Chief McAndrew thought that young volunteer firefighters might be demoralized and discouraged from participating in the Department. (*Id.* ¶¶ 36, 48). Chief McAndrew asked Houston to modify his presentation. (*Id.* ¶ 48). Houston refused, replying that to do so would put lives at risk. (*Id.* ¶ 49). At subsequent training sessions that Chief McAndrew attended, Houston's presentation style remained the same. (*Id.*).

### 3.   Houston resigns as trainer

The July 2011 partial RIC deployment served as the "proverbial straw that broke the camel's back." (Houston Dep. at 107:22-24). On July 8, 2011, Houston sent a letter to Chief McAndrew stating that because of the Department's "repeated disregard of the numerous rules, regulations and guidelines pertaining to the [RIC]," Houston "could no longer function as the training officer of the [RIC]." (Letter from Houston to Chief McAndrew, July 8, 2011). Houston wrote that deploying partial teams "is an extreme safety hazard, as well as being a disservice to the incident commander, who is expecting a fully equipped, staffed and trained [c]omplement of firefighters to respond." (*Id.*). Houston, in his own view, was teaching the proper standards to trainees, but the Department was "completely disregarding those standards when [the RIC was] activated." (*Id.*). He felt that this "promote[d] unsafe practices with potentially fatal consequences." (*Id.*).

Chief McAndrew replied by letter dated July 11, 2011:

I have in the past appreciated your perspective concerning operations and procedures, and have had a few discussions with you debating the merits, pros and cons, and applicability, of both your and my own opinion. What I find troubling is your increasing criticism of the RIC deployments, and now this letter. Although you have an acute recollection of the "rules", you have limited understanding of the application of such. You completely refuse my repeated attempts to explain the nuances and operational differences of our Mutual Aid Departments and my colleague Chiefs. You may disagree with a Command decision, and I have always been willing to discuss the details and circumstances of any and all, but at this point you have gone beyond criticism to become uncooperative (combative). This attitude is detrimental to the operation of the Fire Department, harmful to moral [sic] and is borderline insubordinate.

I accept this "resignation", although a single training "officer" for the RIC was not formally established, and further state that you are not to proctor, lecture, instruct, or participate in any training at all with the RIC, Fire Company 2, or the Department.

At this point, I think some time off is appropriate. I suggest you take a break and re-evaluate if you can be cooperative and participate with this Department.

(Letter from Chief McAndrew to Houston, dated July 11, 2011, Ex. F to Harrison Aff. [ECF No. 32-7]).

On July 12, 2011, Chief McAndrew followed this letter with a memo to Houston's Battalion Chief, Ted Carman. The memo reiterated that Houston was not to be a part of any training activities, and that Houston's "only involvement in [Department] activities is to be observation only, as his allowable activity is still in question." (July 12, 2011 Chief McAndrew Memo to Ted Carman, Ex. G to Harrison Aff. [ECF No. 32-7]).

Houston replied to Chief McAndrew's letter on July 14, 2011, reiterating many of the points made in his resignation letter.[11] Houston did, however, ask that Chief McAndrew reconsider the training ban. This letter noted Houston's significant experience and certifications and stated that permitting him to resume teaching trainees would be a reasonable accommodation of his disability. (Letter from Houston to Chief McAndrew, July 14, 2011, Ex. H to Harrison Aff. [ECF No. 32-7]). The record does not indicate that Chief McAndrew responded to this letter.[12]

The RVFD Bylaws provide for a Board of Past Department Chiefs that advises Department officers and typically serves as a grievance committee. (RVFD Bylaws Art. III, § M, Ex. K to Harrison Aff. [ECF No. 32-8], John McAndrew Aff. ¶ 59). Houston did not complain about Chief McAndrew's interpretation of the RIC rules to the Board of Past Department Chiefs. He did complain to the Board of Past Company #2 Chiefs. (John McAndrew Aff. ¶ 60). The Board of Past Company #2 Chiefs contacted Chief McAndrew to meet with him, but Houston filed this suit before such a meeting could take place. (*Id.* ¶ 61).

Houston remains a member of the RVFD and remains eligible for LOSAP. (*Id.* ¶ 61).

### E.   This Action

Houston filed this action on August 19, 2011. In it, he alleges that Chief McAndrew's response to his resignation letter was in fact a "suspension." The grounds for this suspension, he alleges, were pretextual because it was in fact a form of retaliation for his criticism of the Department's RIC policies. In

---

[11] In the letter, Houston inquired as to how Chief McAndrew found his letter combative and uncooperative. Houston's opposition brief contains quotations from Chief McAndrew's deposition to the effect that Houston was a model firefighter, setting aside these RIC-related disagreements. (Houston Opp. at 3). Houston seems to argue that this shows that McAndrew's acceptance of his resignation was a pretext. But Houston's good performance in areas other than the one that was the basis for acceptance of his resignation is not precisely to the point.

[12] In a recent case, *Burton v. Teleflex, Inc.*, the Third Circuit vacated the district court's grant of summary judgment in favor of the defendant. No. 11-3752, --- F.3d --- - (3d Cir. Feb. 20, 2013) (precedential). There, plaintiff asserted claims under the Age Discrimination in Employment Act and under Title VII of the Civil Rights Act of 1964, and maintained that she had been fired. A genuine dispute existed over whether the plaintiff had, in fact, resigned during an ambiguous oral conversation with her supervisor. *Id.*, slip op. at 19-24. Both the legal basis of the claims and the centrality of the factual dispute over firing distinguish that case from this.

addition, Houston alleges that the RVFD failed to reasonably accommodate his disability when it declined to let him continue to serve as a trainer. He also asserts, generally, that the retaliation includes failing to make LOSAP payments that he earned for calendar years 2009, 2010, and 2011, and that his suspension prevented him from earning enough points to qualify for a LOSAP contribution. His suspension and the failure to pay him benefits, he alleges, violate his rights under the federal and state Free Speech and Equal Protection Clauses, the federal Due Process Clause, the Americans with Disabilities Act, and the New Jersey Conscientious Employee Protection Act (the "CEPA"). He cites 42 U.S.C. § 1985 (conspiracy to violate civil rights) and 42 U.S.C. § 1986 (neglect to prevent a violation of civil rights); he does not cite 42 U.S.C. § 1983, but the court presumes that such a claim was intended.

## II.      THE SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but it should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see *Anderson*, 477 U.S. at 247-48. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

If a party fails to address the other party's properly supported assertion of fact, the court may consider "grant[ing] summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ." Fed. R. Civ. P. 56(e). Local Civil Rule 56.1(a) deems a movant's statement of material facts undisputed where a party does not respond or file a counterstatement. L. Civ. R. 56(a). A failure to dispute a party's statement of material facts, however, "is not alone a sufficient basis for the entry of a summary judgment." *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (holding that even where a local rule deeming unopposed motions to be conceded, the court was still required to analyze the movant's summary judgment motion under the standard prescribed by Fed. R. Civ. P. 56(e)); *see also Muskett v. Certegy Check Servs., Inc.*, Civ. No. 08-3975, 2010 WL 2710555 (D.N.J. July 6, 2010) ("In order to grant Defendant's unopposed motion for summary judgment, where, as here, 'the moving party does not have the burden of proof on the relevant issues, . . . the [Court] must determine that the deficiencies in [Plaintiff's] evidence designated in or in connection with the motion entitle the [Defendants] to judgment as a matter of law.'" (quoting *Anchorage Assocs.*, 922 F.2d at 175)).

Because the law is so clear and the evidence so one-sided as to entitle the Defendants to judgment, I am granting the Defendants' Motion for Summary Judgment.[13]

## III.   FEDERAL CONSTITUTIONAL CLAIMS

### A.   Introduction: The Civil Rights Statutes, Qualified Immunity and the *Monell* Limitation on Municipal Liability

To sustain each of Houston's constitutional claims, it is first necessary to find a viable claim of deprivation of a constitutional right. Even where such a potential violation is identified, however, the court must also analyze two prospective barriers to liability: Chief McAndrew's defense of qualified

---

[13] The arguments in Houston's opposition papers relate only to his First Amendment and CEPA claims. They do not address summary judgment on Houston's federal Due Process, state and federal Equal Protection, ADA, and §§ 1985 and 1986 claims. Nor does Houston address the Township's argument that *Monell* and qualified immunity doctrine shield the Township and Chief McAndrew from liability. Giving Houston the benefit of the doubt, I have nevertheless attempted to analyze these issues.

immunity and the municipality's *Monell* argument that an actionable injury must have resulted from an official policy or custom.

### 1.   Causes of action for violations of constitutional rights

Houston asserts a number of claims for damages based on alleged violations of his rights under the Constitution of the United States. Title 42, United States Code, Section 1983, provides for such a cause of action:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

*See City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 829 (1966) ("Under [§ 1983 state] officers may be made to respond in damages . . . for violations of . . . federal constitutional [rights]"); *West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").

Houston also alleges causes of action for violations of the conspiracy and failure-to-prevent sections of the Civil Rights Act, 42 U.S.C. §§ 1985(3) and 1986. It is most helpful to identify first what, if any, actionable civil rights violations exist under 42 U.S.C. § 1983. I will then analyze the § 1985(3) and § 1986 claims separately.

### 2.   Qualified immunity

"[Q]ualified immunity shields government officials from civil liability as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In analyzing whether qualified immunity attaches to a government official who has moved for summary judgment, a court must "first determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right." *McGreevy*, 413 F.3d at 364 (citing

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If that first step is satisfied, the court must then "determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).

A right is "clearly established" when the "contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202. A clearly established right is not limited to one that "has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Instead, "it merely means that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." *McGreevy*, 413 F.3d at 366 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

The knowledge of a reasonable person "is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Thus, the party asserting that qualified immunity applies is "entitled to [it] if reasonable officials in the defendants' position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards." *Stoneking*, 882 F.2d 726.

### 3.   The Monell *limitation on municipal liability*

Houston has named the Township of Randolph and its Fire Department as defendants. A municipality is not vicariously liable via *respondeat superior* for the constitutional torts of its officials. Rather, a plaintiff must show that any violation of his constitutional rights "implement[ed] or execute[d] a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "In other words, the County may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior* but 'it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom.'" *Mulholland v. Gov't Cty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) and quoting *Beck*, 89 F.3d at 971). Thus there are two

16

paths to municipal liability under § 1983: municipal policy or custom. *Beck,* 89 F.3d at 971.

"Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews,* 895 F.2d at 1480 (internal citations omitted). "An official has policymaking authority for *Monell* purposes when the official is responsible as a matter of state law for making policy in the particular area of county business in question, and the official's authority to make policy in that area is final and unreviewable." *Mulholland,* 706 F.3d at 237 (citing *Hill v. Borough of Kutztown,* 455 F.3d 225, 245–46 (3d Cir. 2006)).

A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law. *Andrews,* 895 F.2d at 1480 (internal citations omitted). "Custom . . . may also be established by evidence of knowledge and acquiescence." *Beck,* 89 F.3d at 971.

In Sections III.B, C & D of this opinion, then, for each of Houston's constitutional claims, I will first analyze the substantive claim and then consider any applicable qualified immunity defense or *Monell* limitation on liability.

**B.     First Amendment Retaliation**

Houston claims that he was "suspended" in retaliation for his vocal disagreement with RIC policies, in violation of his constitutional right to free speech. I find that Houston's statements are not protected by the First Amendment because he was not speaking as a citizen, but rather as a public employee pursuant to his official duties. *A fortiori,* a reasonable public official in Chief McAndrew's position would not necessarily have seen the challenged "suspension" as a constitutional violation, and qualified immunity therefore shields his actions. As to the municipal defendants, I find that there is no proof, or even really an allegation, that any arguable constitutional deprivation resulted from an established policy or custom, as required by *Monell.*

     *1.     The constitutional merits*

A First Amendment retaliation claim has three essential elements:

(1) The plaintiff's speech was protected under the First Amendment;

(2) The defendant took an adverse or retaliatory action; and

(3) A causal connection between (1) and (2), *i.e.,* that the protected speech was a substantial or motivating factor in the retaliatory action, shifting the burden of proof to defendant to demonstrate it would have taken the same action absent the protected speech.

*See Miller v. Mitchell,* 598 F.3d 139, 147 (3d Cir. 2010); *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009); *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001). The first element is an issue of law; the second and third are questions of fact. *Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir. 2001); *Johnson v. Lincoln Univ.,* 776 F.2d 443, 454 (3d Cir. 1985); *see also Gorum, supra.* This discussion focuses on the first.

That First Amendment analysis applies differently to private and public employment, as explained further below. A person who goes into government service does not give up the First Amendment right to express oneself freely *as a citizen.* But limitations may be placed on the speech of public employees *as employees.* The Supreme Court has clearly stated the reasons for limiting First Amendment protection in the public employee context: first, a citizen in government service accepts certain restrictions on his freedom; second, the government, like any employer, must exercise some control over employees' words and actions; and third, a public employee is in a position of public trust, and cannot be permitted to express views that "contravene governmental policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos,* 547 U.S. 410, 418-19 (2006).

The threshold question is therefore whether Houston, as a volunteer firefighter, was the equivalent of a public employee. The Third Circuit case of *Versarge v. Twp. of Clinton N.J.,* 984 F.2d 1359, 1364 (3d Cir. 1993), treated a volunteer firefighter as a public employee for purposes of a First Amendment retaliation claim, and I believe that approach remains sound. [14] Houston's position was so parallel to that of a public employee that it should be treated as

---

[14] *Versarge* predated *Garcetti,* and therefore must be relied on with caution. By a general balancing process, *Versarge* held that the fire department's interests outweighed a volunteer firefighter's First Amendment claim that he was dismissed in retaliation for his complaints about firehouse construction without proper permits. I believe that a post-*Garcetti* court would reach the same result, albeit by a somewhat different route. At any rate, *Versarge*'s public employee analysis is unaffected by *Garcetti.*

such for First Amendment purposes. The RVFD is a municipal entity, (Ex. O to the Harrison Aff. at 1 (acknowledging that the Township has fire companies); *see also* Township Rev. Ordinances § 20-31), and the RVFD fulfills a vital function of municipal government. *See Nat'l League of Cities v. Usery*, 426 U.S. 833, 851, (1976), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) (fire prevention is a "typical" activity "performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services"). The organization of the RVFD is bureaucratic, like that of a municipal department with paid employees. Indeed it is paramilitary, with a chain of command analogous to that of a police department.[15] Houston's involvement, moreover, cannot be regarded as avocational or casual.

Houston, then, will be treated as a public employee. Whether a public employee's speech is protected by the First Amendment depends on three issues:

> (1) was the plaintiff speaking as a citizen rather than as a public employee discharging her employment duties;

> (2) did the plaintiff's statements address a matter of public concern as opposed to a personal interest; and

> (3) did the plaintiff's employer have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement [the employee] made.

*Montone v. City of Jersey City*, Nos. 11-2990 and 11-3516, --- F.3d ---, slip op. at 19-20 (3d Cir. March 8, 2013)[16] (line breaks added) (quoting *Gorum v.*

---

[15] The Fire Department has its own page on the Township of Randolph website that is very similar to the Police Department page. Township of Randolph Fire Department, http://www.randolphnj.org/public_safety/fire_department/ (last visited March 13, 2013).

[16] *Montone* is a recent Third Circuit gender discrimination case in which the plaintiff, a police officer, made a First Amendment retaliation claim because of alleged retaliatory acts arising out of Montone's support for an opposing mayoral candidate and sexual harassment complaints that she made. Slip op. at 3, 8. The Third Circuit held that Montone's statements were matters of public concern, not of private interest. *Id.* at 25. The court noted that Montone would have to prove at trial that she was acting as a citizen and not as a police officer. *Id.* Houston's case is distinguishable because, among other reasons, he was speaking as an employee, Chief McAndrew had an adequate reason for treating Houston as he did, and the Third Circuit treats

19

*Sessoms,* 561 F.3d 179, 185 (3d Cir. 2009), quoting *Garcetti v. Ceballos,* 547 U.S. at 418).

I conclude as a matter of law that Houston's vocal disagreements with RIC policies are not protected by the First Amendment because they fail to satisfy two of the three *Garcetti* factors, all of which are necessary. Under the first prong, Houston spoke as a Fire Department member, not as a citizen, as a matter of law. The second prong, whether the statements raised matters of public concern, I will not rely on; it is at least arguably in Houston's favor. The third, however, is not, because the Department had adequate justification to treat persons in the chain of command differently from members of the public. I now discuss factors one and three in more detail.

A public employee making statements pursuant to his or her official duties is not acting "as a citizen," and those statements are not protected by the First Amendment. *Garcetti v. Ceballos,* 547 U.S. at 421; *see also Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006). As the Supreme Court reasoned in *Garcetti,* "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." 547 U.S. at 421. Therefore, "expressions employees make pursuant to their professional duties" fall outside the protections of the First Amendment. *Id.* at 426. Whether a statement is made pursuant to official duties is a practical inquiry, not limited to the technicalities of the employee's job description. *Id.* at 424. Factors considered include whether the speech fell within the individual's job duties, whether it related to special knowledge or experience acquired on the job, whether it was made inside or outside the work place, and whether it concerned the job's subject matter. *Id.,* 547 U.S. at 420-21; *Gorum,* 561 F.3d at 185.

In short, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti,* 547 U.S. at 424. Reporting to superiors, for example, is unprotected because it does not have a "relevant analogue to speech by citizens who are not government employees." *Id.* Thus the Third Circuit has repeatedly held that "complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other

---

complaints about workplace safety, *see infra* at 20-21, much differently from those regarding sexual harassment. *Montone,* slip op. at 21-22 (noting that *Azzaro v. Cty. of Allegheny,* 110 F.3d 968 (3d Cir. 1997) held that sexual harassment can be as much a matter of public concern as racial discrimination).

employees—are within an employee's official duties" and therefore unprotected. *Morris v. Philadelphia Hous. Auth.*, 487 Fed. App'x 37 (3d Cir. 2012) (non-precedential) (holding that plaintiff's reporting instances of potential misconduct of subordinates to his superiors was within his official job duties); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011) ("Price and Warren were acting within their job duties when they expressed their concerns up the chain of command...."); *Hill*, 455 F.3d at 242 (a town borough manager's reports to his superiors about harassment by the town mayor were not protected speech because his reports were made pursuant to his managerial duties)).

Houston did not speak "as a citizen" when he disagreed with the Department's policies on RIC deployment, property destruction, and drills. The central retaliatory action about which he complains – his "suspension" – allegedly occurred because he criticized RIC protocols to Chief McAndrew. (Houston Opp. at 1-2, 4); *see also* John McAndrew Aff. ¶ 57. These are classic, employment-related complaints up the chain of command. The Third Circuit cases cited above establish that such statements are made as an employee, and are therefore outside the ambit of the First Amendment.[17]

More generally, Houston's statements are employment-based because they fall within the scope of Houston's duties as a firefighter and RIC trainer. He would be expected to inform his superiors and coworkers about perceived safety issues, including those involving RIC policies. And Houston's knowledge of safety procedures and RIC protocols certainly arises from or "relates to special knowledge or experience acquired through his job." *Gorum*, 561 F.3d at 185. In short, Houston's RIC-policy related complaints are public employee speech, not private citizen speech protected by the First Amendment.

The conclusion that Houston spoke as a public employee, even taken alone, is dispositive. His speech is not protected by the First Amendment, and his First Amendment retaliation claims cannot survive summary judgment

---

[17] Houston states that he also made his complaints to fellow firefighters and others. He does not seem to allege that Chief McAndrew suspended him in retaliation for this. In any event, this speech, too, arises from and relates to special job-related experience. And McAndrew would have been within his rights in suspending an employee who was spreading discontent in and about a Department that, like the military, requires unit cohesion, respect for the chain of command, and clarity of purpose. *See* pp. 23 and 33 n.25, *infra*.

scrutiny. *Foraker*, 501 F.3d at 243 (concluding speech was not protected and therefore declining to analyze other First Amendment retaliation factors).[18]

The third prong of *Garcetti*, moreover, supplies an alternative ground to grant summary judgment on the First Amendment retaliation claim. Even assuming *arguendo* that Houston spoke as a citizen, and spoke on a matter of public concern, his "speech is not automatically privileged." *Borough of Duryea, Pa.*, 131 S. Ct. at 2493. A court may then consider whether, in the public employment context, the employer had "adequate justification" to treat the employee in a manner that might have violated the First Amendment with

---

[18] Houston also claims that, in retaliation for his speaking out, he was denied annual LOSAP payments of approximately $1,000 to $1,500 for 2009, 2010 and 2011. (Pre-Trial Order at 6; Houston Dep. at 151: 20-157:24). Issues concerning the existence, or not, of retaliation are not essential to my ruling. I nevertheless note the following.

The record demonstrates that Houston did not earn enough points in 2009 and 2010 to qualify for LOSAP payments. (Thomas McAndrew Aff, ¶¶ 17-20, Exs. 1-3). Despite receiving a tabulation of his point totals for those years, he did not appeal those calculations in writing, as required by the Township's LOSAP Ordinance. (Houston Dep. 155:2-155:8; Thomas McAndrew Aff, ¶ 21, LOSAP Ordinance § B, Ex. O to Harrison Aff. [ECF No. 32-8]). Instead, he maintains, he complained orally to his Battalion Chief, Ted Carman. (Houston Dep. 152:9-153:9).

At any rate, there cannot have been retaliation relating to LOSAP benefits in 2009 because LOSAP eligibility was calculated before Houston's first complaint, which occurred at the end of 2010. (Houston Dep. 50:6-17; *see also* Statement of Undisputed Material Facts ¶¶ 97-99 [ECF No. 32-6]).

For 2010, the year-end calculations indicate Houston did not earn enough points to qualify. (Thomas McAndrew Aff., Ex. 3). While Houston made a conclusory claim at his deposition that he performed additional countable training activities, there is nothing in the record to indicate what those additional activities might have been or what LOSAP value they might have carried. (Houston Dep. 154:10-16). Aside from the conclusory allegation that the Township purposely "lost" his paperwork, Houston did not state any fact, at his deposition or elsewhere, that would permit the court to conclude that he earned additional activity points.

For 2011, there cannot have been retaliation relating to LOSAP benefits because, even though Houston did not return his signed year-end report form as required (or appeal the point tally in writing), he received his LOSAP benefits for 2011. (Thomas McAndrew Aff. Exs. 2-3; Lovell Aff. ¶ 6, Exs. 2-3).

Houston also alleges that his "pretextual suspension" precludes him from participating in LOSAP at a level where he can qualify for a contribution. (Pre-Trial Order at 7). The record indicates that his inability to take part in trainings stemmed from his own decision to resign as a RIC trainer.

regard to a private citizen. To do so, the court must apply the *Pickering* balancing test, weighing "the First Amendment interest of the employee against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968)); *accord Montone*, slip. op. at 24; *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008). "The determination of whether speech is protected pursuant to the *Pickering* balancing test is one of law." *Versarge*, 984 F.2d at 1364.

The government is entitled to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Connick v. Myers*, 461 U.S. 138, 150-51 (1983) (quoting *Ex parte Curtis*, 106 U.S. 371, 373 (1882)). To further that purpose,

> the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick*, 461 U.S. at 151. That is particularly true where, as here, the government employer is a paramilitary organization, in which discipline and respect for authority are essential. *See Rivell v. Civil Serv. Comm'n*, 115 N.J. Super. 64, 72, 278 A.2d 218 (App. Div.), *cert. denied*, 59 N.J. 269, 281 A.2d 531 (1971), *rev'd on other grounds by Henry v. Rahway State Prison*, 81 N.J. 571, 410 A.2d 686 (1980) ("Many New Jersey cases indicate the importance of maintaining discipline within the paramilitary organization of a police department. Refusal to obey orders and disrespect cannot be tolerated. Such conduct adversely affects the morale and efficiency of the department."); *see also Anderson v. Burke Cty., Georgia*, 239 F.3d 1216, 1222 (11th Cir. 2001) ("In addition, a paramilitary organization, such as a fire department has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers.") (internal quotation and citation omitted); *Figueroa-Rodriguez v. Lopez-Rivera*, 878 F.2d 1488, 1489 (1st Cir. 1988) (noting paramilitary nature of fire departments); *Thorne v. City of El Segundo*, 726 F.2d 459, 470 n. 10 (9th

Cir. 1983) (when paramilitary organizations are involved, the state's interest in regulating speech is greatest).

A court must consider whether the plaintiff's speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (citing *Pickering*, 391 U.S., at 570-573). Also important is whether the statement was made in a public or a nonpublic forum. *Roseman v. Indiana Univ. of Pennsylvania, at Indiana*, 520 F.2d 1364, 1368 (3d Cir. 1975),

Houston had numerous, vocal disagreements with Chief McAndrew concerning RIC policy, some of them expressed in front of other officers and in discussions with other firefighters. (John McAndrew Aff. ¶¶ 42-43; Houston Dep. at 95:15-96:8, 102:17-104:20). Even after direct instructions from his superior, Chief McAndrew, Houston would not waver from his determination to train RIC members as he, Houston, believed best. (John McAndrew Aff. ¶¶ 45-46, 49). Although Houston's resignation letter refers to violations of "numerous rules, regulations and guidelines," they are not identified; the "rules" and "guidelines" at issue seem to be nothing more than Houston's own policy preferences. This course of activity clearly had the capacity to impair discipline in the department and interfere with the regular operation of the RVFD. *Rankin*, 483 U.S. at 388.

In *Roseman*, the plaintiff, an associate professor, made statements at a faculty meeting that were critical of the head of her department. Specifically, she alleged that he had improperly reviewed an application for chairmanship of the department. 520 F.2d at 1366. Her contract was not renewed, and she sued, alleging that the university retaliated against her for exercising her right to free speech. *Id.* at 1365. After a bench trial, the district court granted judgment in favor of the university. *Id.* The Third Circuit affirmed. *Id.* In doing so, the Third Circuit applied the *Pickering* balancing test and distinguished *Pickering* in two respects. *Id.* at 1367-68. First, in *Pickering*, the statements at issue related to a pending tax proposal, and were contained in a published letter to the editor of a local newspaper – a "classic example of public communication on an issue of public interest." *Id.* Roseman, by contrast, spoke in a nonpublic faculty meeting, concerning an issue of "less public interest." *Id.* at 1368. Second, Roseman's communications had a

24

> potentially disruptive impact on the functioning of the Department. Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. . . . [P]laintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers.

*Id.* Roseman's statements, in short, raised questions of maintaining "discipline by immediate superiors or harmony among coworkers." *Id.*

Houston's statements are far closer to Roseman's than to Pickering's. The communications that concerned Chief McAndrew were made to him and to other members of the Fire Department – not in a forum open to the general public. The statements were made to, and about, Houston's immediate superior, not some remote public official. The topic – the particular composition of RIC deployments – is of some public concern, to be sure, but does not resemble the quintessential issue of public policy in *Pickering*. Unlike local taxation, RIC deployment is not an issue that citizens are called upon to learn about or vote on. Houston's statements also resemble Roseman's in that they raised doubts about Chief McAndrew's ability to maintain discipline and harmony in a relatively small Department; indeed, they tended to impugn McAndrew's competence and concern for firefighters' safety.

In short, the RVFD's paramilitary structure, combined with the similarity of Houston's statements to those of the plaintiff in *Roseman*, suggests that the *Pickering* balancing test weighs in favor of the Township. So even if Houston had been speaking as a citizen when he disagreed with RIC policy (and I do not think he was), I would nevertheless find that the Township did not violate his First Amendment rights.

Based on these issues of law, the Defendants' motion for summary judgment will be granted as to the First Amendment retaliation claims. That being so, I need not consider the other, more fact-based elements of a retaliation claim (a retaliatory act and causation).[19]

---

[19] I am aware of the recent Third Circuit decision, *Araujo v. N.J. Transit Rail Operations, Inc.*, which held that the plaintiff's suspension without pay constituted unlawful retaliation for reporting a work-related injury. No. 12-2148, --- F.3d ---- (3d Cir. Feb. 19, 2013) (precedential). It does not apply here. First, Araujo brought his

### 2.    Qualified immunity on the First Amendment claim

To get past the qualified immunity hurdle, any "unlawfulness must be apparent," *Anderson v. Creighton*, 483 U.S. 635, 640 (1987), because "qualified immunity provides government officials with leeway in applying difficult or murky law, even if that law is clearly established." *Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1, 34 (D.N.J. 1999). Even assuming *arguendo* that Houston's speech enjoyed First Amendment protection, Chief McAndrew would nevertheless be entitled to qualified immunity. A person in Chief McAndrew's position could reasonably have believed, in light of clearly established law, that Houston spoke as a public employee and that the First Amendment did not shield Houston's speech. A reasonable person could have concluded that allowing Houston to continue as a trainer would undermine the morale and cohesion of the Department and compromise the command decisions that McAndrew as Chief was entitled to make.[20]

As noted above, internal policy-based complaints and disagreements voiced by a public employee do not enjoy First Amendment protection as a matter of law. *A fortiori*, a reasonable fire chief could think so. Whether a public employee's speech was made pursuant to his or her official duties is a "practical" inquiry that includes analyzing numerous factors, including the employee's job description, whether the speech is based on special knowledge or experience obtained through the job, the location (at or outside of work), and the type of content, such as safety issues, misconduct by other employees, or other pertinent job-related subject matter. *Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006); *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009); *Morris v. Philadelphia Hous. Auth.*, 487 Fed. App'x 37 (3d Cir. 2012) (non-precedential). Under such a multifactor test, Chief McAndrew could well have struck the balance reasonably, even if erroneously. *See Carlino*, 57 F. Supp. 2d at 34 (school principal, who removed a field hockey coach in retaliation for a sign she

---

claim under the Federal Rail Safety Act, which explicitly includes anti-retaliation measures for whistleblowers who raise safety concerns in the work setting. *Id.*, slip op. at 10. Second, the parties agreed that Araujo did not resign, but suffered an adverse employment action, which is not the case here. *Id.* at 12 n.4. Third, the Federal Rail Safety Act contains a burden-shifting framework that imposes a "clear and convincing evidence" burden on the employer to rebut retaliation or causation, which is not the case here. 49 U.S.C. § 42121(b)(2)(B)(ii). *See Araujo*, *supra*, slip op. at 16 ("It is worth emphasizing that the . . . burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard.").

[20] For this and all other federal Constitutional claims, Houston's opposition papers failed to address the qualified immunity issue.

placed on her lawn that questioned his suitability as a role model, violated the First Amendment but was nevertheless entitled to qualified immunity, because the *Pickering* balancing test is difficult, fact-intensive, and murky).

I do not hasten to immunize a mistaken deprivation of First Amendment rights, because "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). Here, however, I do not believe any such deprivation occurred. Chief McAndrew is duty-bound to ensure that the RVFD is functioning efficiently and effectively to fulfill its duty to protect the residents of Randolph and neighboring towns. Houston simply disagreed with the manner in which McAndrew did so. McAndrew would not have been unreasonable – would have been correct, in fact – in thinking he had the discretionary authority to enforce his own point of view about, *e.g.,* the proper staffing of a RIC. Accordingly, even if Houston's speech fell under the protection of the First Amendment, Chief McAndrew would be entitled to qualified immunity.

### 3. Monell *liability on the First Amendment claim*

Even if Houston could show that he was deprived of his First Amendment rights, the Township and the Department could not be held liable. Houston has not made any showing, or even alleged, that his "suspension" occurred pursuant to a Township policy or custom. Houston's opposition papers do not address the Township's *Monell* argument, and I see no evidence of an unconstitutional policy or custom in the record. Therefore, under *Monell* and its progeny, there is no municipal liability. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).

Defendants' summary judgment motion will be granted as to the First Amendment relation claims.[21]

---

[21] I reach the same resolution as to any parallel free speech claim under the New Jersey State Constitution. This State's courts "rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution." *Karins v. City of Atlantic City*, 152 N.J. 532, 706 A.2d 706, 713 (1998) (applying federal constitutional analysis to public employee's retaliation claim). In other words, the applicable state and federal legal standards are the same. *Johnson v. Yurick*, 156 F. Supp. 2d 427, 436 (D.N.J. 2001). For the same reasons that Houston's federal free speech claim fails, so does his state cause of action.

### C.      Due Process

#### 1.      Deprivation of procedural or substantive due process

Houston alleges that his "pretextual suspension" violated the Due Process clause. He is not very specific about how, or about the level of process he believes was due. I hold that Chief McAndrew's actions fall short of violating Houston's procedural due process rights because Houston has no property interest in his RIC trainer position and no entitlement to a particular level of procedure. Chief McAndrew's conduct falls short of violating Houston's substantive due process rights because it does not shock the conscience.

To state a claim that he was denied procedural due process, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures afforded him did not constitute "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *accord Iles v. De Jongh*, 638 F.3d 169, 173 (3d Cir. 2011).

"In evaluating a procedural due process claim, we first determine whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." *Baraka v. McGreevey*, 481 F.3d 187, 205 (3d Cir. 2007) (internal quotation and citation omitted). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id*. Moreover, even where there is a recognized property interest, if it is de minimis, the protections of due process do not attach. *Goss v. Lopez*, 419 U.S. 565, 576 (1975); *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993). In short, to satisfy the first prong of a procedural due process property claim, Houston must have a legitimate, more than de minimis, property interest in his volunteer position as a trainer or firefighter. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

The "Supreme Court has held that a public employee with no statutory or contractual entitlement to his employment has no property interest subject to the protection of the Fourteenth Amendment." *Johnson v. Yurick*, 156 F. Supp. 2d 427, 436 (D.N.J. 2001) *aff'd*, 39 Fed. App'x 742 (3d Cir. 2002) (non-precedential) (citing *Bishop v. Wood*, 426 U.S. 341 (1976) and *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)). *A fortiori* this would apply to a volunteer position.

The record does not show that Houston has a statutory entitlement to his position. Further, Houston has no contractual entitlement to be a RIC trainer. While he does not raise this point, I have examined whether the agreement between him and the Department gives rise to a property interest protected by the Due Process Clause. I conclude that it does not. The salient part of the agreement states: "You (as [RIC] captain) will train and administer the [RIC] team." (Houston-RVFD Agreement, Ex. B to Harrison Aff.). It does not seem to be in the nature of an employment contract; rather, it seems to be an effort to define the duties that Houston could still perform in light of his disability. This provision was predicated on Houston's serving as RIC *Captain*. Houston, however, voluntarily stepped down as RIC Captain in January 2011 (and he has not alleged that this is connected to his later resignation as a RIC trainer). Once he resigned as RIC Captain, this provision loses its force and it cannot constitute a contractual entitlement for the purposes of the Due Process Clause. And even this ignores the question of whether Houston was *deprived* of any property interest; he resigned from the position of trainer, and remains associated with the Department.

Houston argues that his property interest may lie in certain benefits ancillary to his volunteer position, such as the incentive payments under the LOSAP point system. Initially, I fail to see why such benefits would entitle Houston to more process than one deprived of a salaried position. *See Johnson, supra.* The claimed benefits, moreover, have no independent significance; they are entirely a function of Houston's volunteer employment.

In *Versarge v. Twp. of Clinton N.J.,* the Third Circuit considered whether certain ancillary benefits might give a volunteer firefighter a protectable property interest in his position. 984 F.2d at 1370. That plaintiff, like Houston, did not receive monetary compensation; instead, his volunteer position afforded him training, workers' compensation, and access to the firehouse as a social area. *Id.* The Third Circuit found little independent value in these benefits because they were "inextricably tied" to the plaintiff's position as a volunteer firefighter. Unless the plaintiff was working as a volunteer firefighter, they were largely useless. *Id.* They did not constitute property independent of his firefighter position, and therefore did not entitle plaintiff to any additional due process consideration.

The same is true for Houston. The record is bare as to the benefits Houston receives, aside from LOSAP.[22] LOSAP payments are annual incentives, in the $1000 range at most. They are intimately tied to activities that Houston may choose to perform in his position as a volunteer firefighter. Moreover, he does not have to be a trainer to be eligible for them. Unlike the plaintiff in *Versarge*, Houston remains a member of the RVFD. This compels the conclusion that he has not been deprived of any property interest arising from these benefits ancillary to his volunteer position.

Finally, the fact remains that Houston quit as trainer; he was not fired. And he remains a part of the Department. Whatever procedures are due – and Houston is silent on this – they were not violated by Chief McAndrew's accepting Houston's letter of resignation.

Because Houston does not specify the kind of due process deprivation he claims, I briefly consider whether the RVFD encroached upon Houston's substantive due process rights.

"[T]o prevail on a substantive due process claim, 'a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience.'" *Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009) (quoting *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citation omitted)). In other words, "the substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that shocks the conscience." *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). As a matter of law, "mere negligence is insufficient to trigger constitutional liability." *Fagan*, 22 F.3d at 1306 (citing *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). While the "shocks the conscience" standard lacks precise contours, such actions tend to "'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those

---

[22] The record discloses that Houston received the LOSAP benefits to which he was entitled in any event. *See* p. 22 & n. 18, *supra*. The pre-trial order contains a claim that Houston might receive free family memberships to the local YMCA and tuition assistance for community college classes, but nothing in the record supports that. I ordinarily would not consider them. *Versarge*, 984 F.2d 1359, 1370 ("unsubstantiated arguments made in briefs or at oral argument are not evidence to be considered"). At any rate, they do not seem to have become unavailable to Houston when he ceased acting as a trainer (but remained associated with the Department).

charged with the most heinous offenses.'" *Fagan v. City of Vineland*, 22 F.3d at 1303 (quoting *Rochin v. California*, 342 U.S. 165, 169 (1952) (upholding substantive due process claim in barring admission of evidence at a criminal trial that the police had gathered by forcibly using a stomach pump on the defendant)).

Houston fails to establish a substantive Due Process claim because his treatment falls far short of "an abuse of official power that shocks the conscience." *Fagan*, 22 F.3d at 1303 (citing *Collins*, 503 U.S. at 128). Taking Houston up on his resignation as a trainer and suggesting he take a break from the RVFD is a far cry from "'offend[ing] those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" *Fagan*, 22 F.3d at 1303 (quoting *Rochin*, 342 U.S. at 169).

In short, Houston does not meet the standards needed to proceed with his Due Process claims.[23]

> ### 2.   *Qualified immunity and* Monell *municipal liability on the due process claim.*

The first step of the qualified immunity analysis is whether Chief McAndrew's conduct violated Houston's due process rights. *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005). As discussed *supra*, it did not. *A fortiori,* a reasonable fire chief could have believed that he did nothing wrong in accepting Houston's resignation from the training component of his volunteer position. Therefore, Houston would be entitled to qualified immunity, and summary judgment in his favor would be appropriate.

Even if Houston could show that he was deprived of his Due Process rights, which he has not, the Township would not be liable because Houston has not alleged or made any showing that the Township has a policy or custom

---

[23] One of the Plaintiff's legal issues included in the Pre-Trial Order is that the Township violated Houston's Due Process and Equal Protection rights by retaliating against him after concluding that he had consulted an attorney with regard to the Department's partial RIC deployment policy. (Pre-Trial Order at 48). Houston's Certification in opposition to summary judgment includes allegations that the Town Manager believed Houston was setting the town up for a lawsuit. (Houston Cert. ¶ 27 [ECF No. 45-2]). However, neither his Certification nor the provided deposition excerpts connects this allegation to Chief McAndrew's response to Houston's resignation letter.

that led to or was related to, *e.g.*, this deprivation of training positions in the RVFD or LOSAP benefits. Therefore, under *Monell* and its progeny, the Township would not be liable.[24]

### D.   Equal Protection

Houston's Complaint alleges a "class of one" cause of action under the Equal Protection Clause. Summary judgment is appropriate because there is no indication Houston was treated differently from any other similarly situated person, or that any difference in treatment lacked a rational basis.

The federal Equal Protection Clause mandates that "persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Two kinds of Equal Protection claims exist: "(1) [the plaintiff] is a member of a protected class similarly situated to members of an unprotected class and was treated differently from the unprotected class; or (2) he belongs to a 'class of one' and was intentionally treated differently from others similarly situated without any rational basis." *Mayer v. Gottheiner*, 382 F. Supp. 2d. 635, 651 (D.N.J. 2005) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) and *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)).

Disability is not considered a suspect classification. *Bd. of Trs. of Univ. of Al. v. Garrett*, 531 U.S. 356, 367 (2001). Such non-suspect classifications are analyzed using rational basis review, *i.e.*, whether there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. *Garrett*, 536 U.S. at 567. Thus the analysis of any disability-discrimination claim would merge with that of the class-of-one claim.

Houston alleges that his Equal Protection rights were violated because the Township intentionally treated him, as an individual, differently from similarly situated individuals without a legitimate rational basis. (Compl. ¶¶ 27, 36 [ECF No. 1]). *See Mayer v. Gottheiner*, 382 F. Supp. 2d. 635, 651 (D.N.J. 2005) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)). Under such a class-of-one theory, the Third Circuit has held, "'a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 243 (3d

---

[24] Houston's Complaint does not include a due process claim under the New Jersey State Constitution.

Cir. 2008) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006)). A class-of-one theory, however, is a "poor fit" in the context of public employment; there, "[t]o treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 605 (2008).

There is no indication that Chief McAndrew's treatment of similarly situated individuals – whether viewed as other disabled firefighters, other firefighters who trained RIC members, other firefighters who expressed disagreement with RVFD policy, or other firefighters generally – was any different from his treatment of Houston. At any rate, Chief McAndrew provided a rational basis for removing Houston from training activities: Houston had resigned. He also provided an alternative rational basis for relieving Houston of training duties or suggesting some time off (while not removing Houston from the RVFD): Houston's combative attitude and inflexible opposition to RVFD policy were insubordinate, they harmed morale, and they discouraged young firefighters from participating. Summary judgment is appropriate on the merits of the equal protection claim.[25]

---

[25] Houston's analogous claim under the state constitution fares no better.

Article I, paragraph 1 of the New Jersey State Constitution reads: "All persons are by nature free and independent, and have certain natural and inalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." It has been held to provide the same equal protection of the laws provided under the federal Constitution. *Barone v. Dep't of Human Servs.*, 107 N.J. 355, 367, 526 A.2d 1055, 1062 (1987). Analysis of equal protection claims brought under the New Jersey Constitution usually does not diverge from that under the federal Constitution. *See id.* As under the federal Constitution, a disability is not considered a suspect classification. *Levine v. Insts. & Agencies of N.J.*, 84 N.J. 234, 259, 418 A.2d 229, 242 (1980). New Jersey courts have therefore analyzed disability-based state and federal equal protection claims under the rational basis test. *Barone*, 107 N.J. at 369, 526 A.2d at 1063; *Brown v. State*, 356 N.J. Super. 71, 79-80, 811 A.2d 501, 506 (2002).

The "critical issue" is "whether there is an appropriate governmental interest suitably furthered by the differential treatment involved." *Barone*, 107 N.J. at 368, 526 A.2d 1055 (internal quotations omitted). As stated, Chief McAndrew's actions did not infringe on any of Houston's rights. And, even if they did, the RVFD had an overriding governmental interest in maintaining its cohesion and morale. *See Rivell v. Civil Serv. Comm'n*, 115 N.J. Super. 64, 72, 278 A.2d 218 (App. Div.), *cert. denied*, 59 N.J. 269, 281 A.2d 531 (1971), *rev'd on other grounds by Henry v. Rahway State Prison*, 81 N.J.

*A fortiori,* qualified immunity would shield Chief McAndrew from liability. In determining whether qualified immunity applies, the Court must first determine whether Chief McAndrew's conduct violated Houston's rights under the Equal Protection Clause. *McGreevy v. Stroup,* 413 F.3d 359, 364 (3d Cir. 2005). As discussed *supra,* it did not. And Chief McAndrew certainly could reasonably have believed that he was acting within his broad discretion in personnel matters. Therefore, Chief McAndrew would be entitled to qualified immunity, and summary judgment in his favor would be appropriate.

Here, as elsewhere, the Township and the Department cannot be liable because Houston has not alleged or made any showing that any of the allegedly discriminatory actions taken by Chief McAndrew resulted from any municipal policy or practice. Therefore, under *Monell* and its progeny, the municipal defendants would not be liable.

### E.    42 U.S.C. §§ 1985 and 1986

Houston's Complaint alleges conspiracy to deprive him of his civil rights pursuant to 42 U.S.C. § 1985(3), and failure to prevent that § 1985(3) conspiracy, pursuant to 42 U.S.C. § 1986. These claims fail because Houston does not establish a conspiracy or a predicate deprivation of civil rights that was the object of the conspiracy.

---

571, 410 A.2d 686 (1980) ("Many New Jersey cases indicate the importance of maintaining discipline within the paramilitary organization of a police department. Refusal to obey orders and disrespect cannot be tolerated. Such conduct adversely affects the morale and efficiency of the department."); *see also Anderson v. Burke Cty., Georgia,* 239 F.3d 1216, 1222 (11th Cir. 2001) ("In addition, a paramilitary organization, such as a fire department has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers.") (internal quotation and citation omitted); *Figueroa-Rodriguez v. Lopez-Rivera,* 878 F.2d 1488, 1489 (1st Cir. 1988) (noting paramilitary nature of fire departments); *Thorne v. City of El Segundo,* 726 F.2d 459, 470 n. 10 (9th Cir. 1983) (when paramilitary organizations are involved, the state's interest in regulating speech is greatest).

While the New Jersey Supreme Court has not ruled on the issue, I do not think it would disagree with *Engquist, supra,* that an equal protection "class of one" claim is ill-suited to the public employment context. *See Cuozzo v. Cimino,* A-5431-10T1, 2012 WL 3116814, at *4 (N.J. Super. Ct. App. Div. July 20, 2012) ("No case in New Jersey recognizes the class-of-one theory of equal protection in the context of public employment, and our Supreme Court's analysis of our own Constitution in *Greenberg v. Kimmelman,* 99 N.J. 552 (1985), offers . . . no hope that it would do so here.").

Title 42, United States Code, Section 1985(3), permits a plaintiff to bring a claim that two or more people have acted together to deprive him of his civil rights. A plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)).

As to the first element, "[t]o constitute a conspiracy, there must be a meeting of the minds." *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008). As for the second, "a claimant must allege 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action' in order to state a claim." *Farber*, 440 F.3d at 135 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)) (emphasis omitted). Further, a § 1985(3) class must have an "identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct" such that a reasonable person could determine who was in the class based on objective criteria. *Farber*, 440 F.3d at 136.

Houston has not shown any meeting of the minds, or any violation of his civil rights. As established in the preceding sections of this Opinion, Houston has not demonstrated that there is a viable underlying claim of deprivation of civil rights that could have been the object of such a conspiracy, and he does not identify any other independent conspiratorial object. His § 1985(3) conspiracy claim, therefore, must fail.

Houston also asserts a cause of action for failing to prevent the conspiracy under 42 U.S.C. § 1986. "Section 1986 is a companion to § 1985(3) and provides the claimant with a cause of action against any person who, knowing that a violation of [§] 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution." *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980). A "§ 1986 claim is, by definition, dependent on a pre-existing violation of § 1985(3)." *Koger v. Kaplan, Inc.*, 169 Fed. App'x 682, 684 (3d Cir. 2006) (non-precedential) (citing *Rogin*, 616 F.3d at 696); *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). Aside from showing a violation of § 1985(3),

> a § 1986 plaintiff must show that: (1) the defendant had
> actual knowledge of a § 1985 conspiracy, (2) the defendant
> had the power to prevent or aid in preventing the
> commission of a § 1985 violation, (3) the defendant neglected
> or refused to prevent a § 1985 conspiracy, and (4) a wrongful
> act was committed.

*Clark*, 20 F.3d at 1295 (citing *Perez v. Cucci,* 725 F. Supp. 209, 254
(D.N.J.1989), *aff'd,* 898 F.2d 142 (3d Cir. 1990)). Summary judgment is proper
on this duty-to-protect claim because the necessary predicate, an underlying §
1985(3) conspiracy, does not exist here.

Because there is no violation of § 1985(3) or § 1986, I must grant
summary judgment on those claims. Indeed, for the reasons stated above in
this section, I will enter summary judgment on all of Houston's constitutional
claims.

## IV.     AMERICANS WITH DISABILITIES ACT

The Americans With Disabilities Act, or ADA, prohibits discrimination
against certain disabled individuals. Title I, 42 U.S.C. § 12111-12117, covers
employment; Title II, 42 U.S.C. §§ 12131-12165, applies to public programs
and activities; Title III, 42 U.S.C. §§ 12181-12189, encompasses public
accommodations; Title IV, 47 U.S.C. § 225, addresses telecommunications; and
Title V, 42 U.S.C. 12201-12213, contains miscellaneous technical, anti-
retaliation and coercion provisions. Houston alleges that the Township, in
refusing to reinstate him as a trainer and pretextually suspending him, failed
to provide reasonable accommodation for his disability. Such claims appear to
potentially implicate only Titles I and II.

### A.     ADA Title I

Houston's claim under ADA Title I must be dismissed for failure to
exhaust administrative remedies.

Title I prohibits an employer from discriminating "against a qualified
individual on the basis of disability in regard to job application procedures, the
hiring, advancement, or discharge of employees, employment compensation,
job training, and other terms, conditions, and privileges of employment." 42
U.S.C. § 12112. "To establish a prima facie case of discrimination, a plaintiff
must show (1) that he is disabled within the meaning of the ADA, (2) that he is

otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). Houston argues that the RVFD refused to make a reasonable accommodation for his disability by continuing to allow him to serve as a trainer. (Pre-Trial Order at 6). Putting aside that Houston resigned, he did not follow the administrative procedure proscribed by Title I. Therefore, his claim cannot survive summary judgment.

Assuming RVFD is covered by Title I at all,[26] Houston was required to pursue his claim before the Equal Employment Opportunity Commission before filing suit. The ADA procedures are the same as those under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. *See Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999). The "prerequisites to a suit under Title VII are the filing of charges with the EEOC and the receipt of the Commission's statutory notice of the right to sue." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "[A] party must wait 180 days after filing a charge with the EEOC for ADA violations before being able to forego the administrative process and file suit in court." *Churchill*, 183 F.3d at 190; *see* 42 U.S.C. § 2000e-5(e)(1). After the 180 day-period, "'if a complainant is dissatisfied with the progress the EEOC is making on his or her charge of employment discrimination, he or she may elect to circumvent the EEOC procedures and seek relief through a private

---

[26] A viable ADA Title I claim presupposes that an employer is covered by the statute. An employer is "a person [or any agent thereof] engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). An employee is defined, less than helpfully, as "an individual employed by an employer." 42 U.S.C. § 12111(4). Whether someone is an employee (and is countable toward the minimum of 15) turns on "the hiring party's right to control the manner and means by which the product is accomplished." *Nationwide Mutual Ins. v. Darden*, 503 U.S. 318, 323 (1992) (internal quotation omitted); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 180 (3d Cir. 2009) (identifying relevant factors for determining employee status under Title VII).

In *Tawes v. Frankford Volunteer Fire Co.*, Civ No. 03-842, 2005 WL 83784, at *6 (D. Del. Jan. 13, 2005), the court found that Title I did not apply to a fire company because it had fewer than 15 employees. The court decided that the volunteers did not count as employees, which kept the fire department below the threshold. Here, I do not have sufficient information to apply the definition of "employee" to RVFD's volunteer firefighters. Nor can I determine whether RVFD has enough undisputed employees to moot the volunteer issue.

enforcement action in a district court.'" *Churchill*, 183 F.3d at 190 (quoting *Occidental Life Ins. Co. of California v. EEOC*, 432 U.S. 355, 361 (1977)).

Filing an administrative claim before the EEOC was a prerequisite to Houston's claim under Title I of the ADA. *See Churchill*, 183 F.3d at 190. Only once that hurdle has been surmounted can a court consider whether he is qualified for the job with a reasonable accommodation. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). Because Houston did not exhaust administrative remedies, summary judgment for defendants will be granted on the Title I claim.

### B.    ADA Title II

The Township must also be granted summary judgment on Houston's Title II claim. Houston's claim falls short because the privilege of volunteering as a firefighter is not a government benefit or service covered by Title II. In any event, Houston was not excluded from participating in the RVFD.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,[27] or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To establish a *prima facie* case of disability discrimination under these statutes, the plaintiffs must demonstrate that: (1) they are qualified individuals with disabilities within the meaning of the statutes; (2) they are being excluded from participation in, or are being denied the benefits of the services, programs, or activities of a covered entity, or are otherwise being discriminated against by the covered entity; and (3) such exclusion, denial of benefits, or discrimination is by reason of their disability." *Disabled in Action of PA. v. Nat'l Passenger R.R. Corp.*, 418 F. Supp. 2d 652, 655 (E.D. Pa. 2005). "Once a plaintiff establishes a prima facie showing of discrimination, he or she has the burden of articulating reasonable accommodations that the defendant can make in order to comply with the ADA . . . . The burden then shifts to the defendant to make any reasonable accommodations, unless the defendant can prove that the accommodations would be unduly burdensome or fundamentally alter the program." *Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 565 (E.D. Pa. 2007) (citing *Frederick L. v. Dep't of Public Welfare of Com. of*

---

[27] As the parties have not addressed the issue, I assume without deciding that the RVFD is a "public entity" within the meaning of Title II. *Tawes*, 2005 WL 83784, at *6 n.4.

*Pennsylvania*, 364 F.3d 487, 492 n. 4 (3d Cir. 2004) (construing *Olmstead v. L.C.*, 527 U.S. 581, 587 (1999)).

Some courts have held that Title II's clause, "no qualified individual with a disability shall . . . be subjected to discrimination", 42 U.S.C. § 12132, is broad enough to include employment discrimination by a public entity. *Bledsoe v. Palm Beach Cty. Soil & Water Conserv. Dist.*, 133 F.3d 816, 822 (11th Cir. 1998); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995).

Other courts have rejected this reasoning, limited Title II to "programs, services, and activities," 42 U.S.C. 12132, and relegated all employment-related claims to Title I. *Zimmerman v. Oregon DOJ*, 170 F.3d 1169, 1173 (9th Cir. 1999), for example, held that Congress did not intend Title II to apply to public employment because the phrase "services, programs, and activities" applies to the "outputs" of a public agency, not to "inputs" such as employment. *See also Mary Jo C. v. New York State & Local Ret. Sys.*, 707 F.3d 144 (2d Cir. 2013) ("we conclude that the statute unambiguously limits employment discrimination claims to Title I. A public employee may not bring a Title II claim against his or her employer . . . ."); *Patterson v. Illinois, Dept. of Corr.*, 35 F. Supp. 2d 1103, 1110 (C.D. Ill. 1999) ("this Court holds that Congress clearly intended for employment disputes, whether arising from public or private employment, to be brought only under Title I of the ADA").

The Third Circuit has not spoken on this issue. One Delaware district court case, however, has adopted the *Zimmerman* "input/output" theory of Title II's scope. *Tawes v. Frankford Volunteer Fire Co.*, Civ No. 03-842, 2005 WL 83784, at *6-*7 (D. Del. Jan. 13, 2005) (unpublished). *Tawes* held that a fire department's "output" is the "service of protecting the community against fires," and that therefore Title II guards "against discrimination in providing that service" – not against discrimination in the employment of firefighters.

I agree. Title I is the employment discrimination provision, and it is carefully tailored to remedy that social evil. Title II is aimed at other forms of discrimination in the provision of services and benefits. The business of a volunteer fire department is protecting the community against fires. Title II guards against discrimination in the provision of that firefighting service. Houston does not allege, and the record does not indicate, that he was denied fire protection, on a discriminatory or any other basis. For this reason, too, I would grant summary judgment.

There is no general requirement under Title II, as there is under Title I, that the plaintiff exhaust his administrative remedies before the EEOC. *Disability Rights N.J., Inc. v. Velez*, Civ. No. 10-3950, 2011 WL 4436550, at *7 (D.N.J. Sept. 23, 2011) (citing *Smith v. City of Philadelphia*, 345 F. Supp. 2d 482, 487 (E.D. Pa. 2004)). That omission probably reflects nothing more than the improbability that Title II applies to employment discrimination at all. Title I, the employment discrimination provision, is accompanied by an administrative apparatus to ensure that most claims can be handled informally and expeditiously. To permit all employees in the vast public sector to circumvent that regime by simply filing under Title II would make a hash of that scheme. At the very least, this suggests that if a Title II employment discrimination remedy is to be implied, then an exhaustion requirement should be implied as well.[28]

In short, Title II is not a valid basis for Houston's claim.

## V.   THE STATE CEPA CLAIM[29]

Houston alleges that the Township violated the Conscientious Employees' Protection Act ("CEPA"), a so-called "whistleblower statute." Houston alleges that the Township took an adverse employment action against him as a punishment for stating that the RVFD's partial deployments of the RIC were improper. (Houston Opp. at 1). This claim fails because Houston has not raised a triable issue that he had an objectively reasonable belief that Chief McAndrew's RIC deployment practice violated a law, rule, or regulation promulgated pursuant to law, or contravened a clear mandate of public policy.

---

[28] Even assuming that there is a Title II cause of action, and that exhaustion of remedies is not required, Houston's claim is still defective. Houston argues that he has a disability and that the RVFD discriminated against him because of it. (Pre-Trial Order at 5). But Houston cannot make a *prima facie* showing of the second and third prongs. *See Disabled in Action, supra.* Houston was not excluded from participating in the RVFD; he remains a member and can accrue LOSAP activity points. Any limitation on his participation is a result of his resignation as a RIC trainer and any other arguable limits Chief McAndrew put on Houston's participation in the RVFD resulted from Houston's prickly, insubordinate attitude, and were unrelated to his disability.

Because Houston cannot make a *prima facie* showing of disability discrimination, the Court need not evaluate whether Houston has carried his additional burden of articulating a reasonable accommodation.

[29] Houston's claims under the New Jersey State Constitution are analyzed in notes to the analogous federal constitutional claims. *See* nn. 21 and 25, *supra.*

The standards cited by Houston do not in fact require that a RIC team be deployed as a whole unit from a single fire department. Moreover, they are not mandatory, and they explicitly direct individuals to use their own judgment.

CEPA was enacted to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 431, 650 A.2d 958, 971 (1994). To effectuate that aim, the statute provides, in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:

> (c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare . . . .

N.J. Stat. Ann. § 34:19-3. A retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e).

To make out such a CEPA claim, a plaintiff must demonstrate that:

> (1)   he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;

> (2)   he or she performed a "whistle-blowing" activity described in N.J. [Stat. Ann. §] 34:19-3c;

> (3)   an adverse employment action was taken against him or her; and

> (4)   a causal connection exists between the whistle-blowing activity and the adverse employment action.

41

*Dzwonar v. McDevitt*, 177 N.J. 451, 462, 828 A.2d 893, 900 (2003) (line breaks added). New Jersey courts have emphasized that the "significant element" is that the employee must have an "*objectively* reasonable belief . . . that such activity is either illegal, fraudulent or harmful to the public health, safety or welfare *and* that there is a substantial likelihood that the questioned activity is incompatible with a constitutional, statutory or regulatory provision, code of ethics, or other recognized source of public policy." *Massarano v. New Jersey Transit*, 400 N.J. Super. 474, 490, 948 A.2d 653, 663 (App. Div. 2008) (emphasis in original) (quoting, adding emphasis, *Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 193, 707 A.2d 1000 (1998)).

In *Dzwonar*, the New Jersey Supreme Court further explained how a plaintiff could proceed with a CEPA claim:

> [N.J. Stat. Ann. §] 34:19-3c does not require a plaintiff to show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true. Instead, a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred. In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable.

*Dzwonar*, 177 N.J. at 464, 828 A.2d at 901-02.

The New Jersey Supreme Court has adopted the *McDonnell Douglas* burden-shifting analysis for CEPA claims. *Winters v. N. Hudson Reg'l Fire & Rescue*, 212 N.J. 67, 90, 50 A.3d 649, 662 (2012) (stating that *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 97, 570 A.2d 903 (1990) adopted the framework for Title VII disparate treatment claims stated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to CEPA claims). Under this test, the employee carries the initial burden of establishing a prime facie case of retaliation. *Winters*, 212 N.J. at 90, 50 A.3d at 662 (citing *McDonnell Douglas*, 411 U.S. at 802). The burden then shifts "'to the employer to articulate some

legitimate, nondiscriminatory reason'" for the adverse employment action. *Winters*, 212 N.J. at 90, 50 A.3d at 662 (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer can do so, "'the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the [employee].'" *Winters*, 212 N.J. at 90, 50 A.3d at 662 (quoting *Blackburn v. United Parcel Serv., Inc.,* 179 F.3d 81, 92 (3d Cir. 1999)). The employee then must persuade the "fact finder that the employer's reason was false 'and that [retaliation] was the real reason.'" *Winters*, 212 N.J. at 90, 50 A.3d at 662 (quoting *Blackburn*, 179 F.3d at 92 (internal quotation and citation omitted)). The ultimate burden of proof remains with the employee. *Winters*, 212 N.J. at 90, 50 A.3d at 662 (citing *McDonnell Douglas,* 411 U.S. at 804–05).

The threshold CEPA issue is whether the plaintiff has identified either "a law, or a rule or regulation promulgated pursuant to law" N.J.S.A. 34:19-3c(1), or "a clear mandate of public policy concerning the public health, safety or welfare," N.J.S.A. 34:19-3c(3), which the employer has allegedly violated. *Mehlman*, 153 N.J. at 187-88, 707 A.2d 1000. A "clear mandate of public policy," in turn, "conveys a legislative preference for a readily discernible course of action that is recognized to be in the public interest." *Massarano*, 400 N.J. Super. at 489, 948 A.2d at 662. "'Clear mandate' . . . suggests an analog to a constitutional provision, statute, and rule or regulation *promulgated pursuant to law* such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." *Maw v. Advanced Clinical Comms., Inc.*, 179 N.J. 439, 444, 846 A.d 604, 607 (2004) (emphasis in original). "'A vague, controversial, unsettled, or otherwise problematic public policy does not constitute a clear mandate.'" *Smith-Bozarth v. Coal. Against Rape & Abuse, Inc.*, 329 N.J. Super. 238, 245, 747 A.2d 322, 325 (App. Div. 2000), *abrogated on other grounds by Dzwonar*, 177 N.J. 451 (quoting *MacDougall v. Weichert*, 144 N.J. 380, 3921 (1996)). "'Sources of public policy include the United States and New Jersey Constitutions; federal and state laws and administrative rules, regulations and decisions; the common law and specific judicial decisions; and in certain cases, professional codes of ethics.'" *Smith-Bozarth*, 329 N.J. Super. 238 (quoting *MacDougall*, 144 N.J. at 391).

Houston's claim does not surmount this threshold. Houston asserts, and no doubt sincerely believes,[30] that a RIC team should not be deployed unless

---

[30] For purposes of Houston's argument, I assume that the witnesses he might call at trial, Ted Carman, William Wagner, and John Pedrick, might agree with Houston. The Pretrial Order states that Houston intends to prove that Chief McAndrew

and until an entire team has formed at the firehouse. That belief, however, is not rooted in any law, rule, or clear mandate of public policy.

Houston points to two written sources of public policy: National Fire Protection Association Standard 1407 ("Standard 1407"), entitled "Standard for Fire Service Rapid Intervention Crews." (Ex. L to Harrison Aff. at 4, 15 [ECF No. 32-9]) and the Morris County RIC Best Practices Guidelines (the "Guidelines"), which RVFD adopted in February 2011. (Ex. C to Harrison Aff. [ECF No. 32-7]; John McAndrew Aff. ¶ 21). The standard under CEPA for such public policy documents is that they have been "promulgated pursuant to law." *Massarano*, 400 N.J. Super. at 489, 948 A.2d at 662. Examples include state and federal statutes, administrative rules and regulations, and judicial opinions. *Smith-Bozarth*, 329 N.J. Super. at 238. Standard 1407 is promulgated by a private organization, and the Guidelines, while adopted by the RVFD, state that anyone using them should "rely on his or her own independent judgment or, as appropriate, seek advice."[31] Neither presents itself as mandatory or authoritative; neither purports to limit the discretion of a fire chief.

For purposes of argument, however, I will assume in Houston's favor that Standard 1407 and the Guidelines are authoritative statements of public policy. The fact remains that they do not mandate the whole-team approach to assembling a RIC. Standard 1407 and the Guidelines are silent as to whether the members of the responding RIC must be deployed from the same firehouse. Because neither document establishes a protocol on whole or partial RIC deployments, Houston cannot establish that Chief McAndrew violated any such protocol. Nor do they help establish that Houston's own belief was objectively reasonable based on a clear mandate of public policy. *See Dzwonar* 177 N.J. at 467, 828 A.2d at 903 (holding that where plaintiff and defendant had divergent but reasonable interpretations of a statute, the plaintiff did not have an objectively reasonable belief that defendant was violating the law).

---

ordered the partial deployments unilaterally. (Pretrial Order at 29-32). It is noteworthy that the proffered testimony of William Wagner, a former Chief of RVFD, does not contradict what Chief McAndrew has stated is the customary practice of the Morris County mutual aid agencies. Again, Houston has not presented his proofs in the required manner, but I have examined the record in search of support for his position in opposition to the summary judgment motion.

[31] The Guidelines also note that the committee creating the document (1) did not independently test or evaluate any information or the soundness of judgments in any code or standard and (2) makes no guaranty or warranty as to the accuracy or completeness of any information therein. *See* Guidelines at 2.

44

In fact, the sources Houston cites do not even state a consistent standard for the size, let alone the composition, of a RIC team. First, the "Personnel" section of Standard 1407's Standard Operating Procedure states that "[t]he [RIC] team shall consist of a minimum of two personnel, but four personnel are preferred and shall be used when possible." (*Id.* at 18, § 4.1). Second, North Hudson Regional Fire & Rescue, where Houston worked previously as a firefighter, had a minimum staffing requirement of three individuals for a RIC. (Houston Dep. 33:20-34:25, 41:9-16). Third, the Guidelines state that the "responding RIC will have a roll call of minimum (1) SUPERVISOR, (1) LEADER and (3) RIC members." (Guidelines §§ 7.3).

In short, this allegedly fundamental public policy mandating the "whole team" approach is not written anywhere.[32]

It is true that a public policy may also be found where a practice, although not proscribed in writing, is "indisputably dangerous to the public health, safety, or welfare." *Maw*, 179 N.J. at 448. The partial-team option is not such a practice. It may be that waiting to assemble and deploy a team whose members have trained together is preferable. Houston has stated that as his opinion, but a personal opinion is not a policy mandate. Nor has Houston produced any evidence regarding the comparative safety of the whole-team and partial-team methods. Indeed, he has not offered even an anecdotal example of the partial-team approach ever having hurt or endangered anyone. I may even assume *arguendo* that there may be some evidence somewhere that the whole-team method has its advantages. It nevertheless remains true that the partial-team method has the advantage of speed, always an important consideration in responding to a fire. *A fortiori*, a reasonable fire chief could think so. Delaying the RIC's deployment (or withholding it entirely for lack of a quorum) carries its own potential for danger. The whole-team vs. partial-team question thus seems, at best, debatable. At any rate, I find no clear statement of public policy or evidence of record that could discharge plaintiff's burden with respect to the whole-team method.

If there is one clear policy, it is the policy that this issue be left to the discretion of the fire company commanders. Chief McAndrew has taken the

---

[32] Houston himself was on the committee that drafted the Guidelines. (Houston Cert. ¶ 5). Assuming Houston ever stated his position, it obviously did not prevail in committee.  A minority position does not constitute an authoritative mandate of public policy.

view that it is better and safer to send available personnel quickly and assemble a RIC at the fire site than to delay or withhold help. That judgment would seem to be within his discretionary authority as Chief. And the established practice in Morris County is to defer to the judgment of the Incident Commander ("IC") as to the deployment of RIC resources. (John McAndrew Aff. ¶¶ 49-53).

On this record, Houston cannot make a showing that there is an objective basis for a reasonable belief that the partial-team RIC option violated a law, rule, or clear mandate of public policy. He cannot advance beyond the first stage of a *prima facie* showing of a CEPA claim, and summary judgment would be appropriate on that basis alone.[33]

In short, the record indicates that Houston did not have an objectively reasonable belief in the violation of a clear mandate of public policy. His CEPA claim cannot survive the Defendants' summary judgment motion.

---

[33] Although it is not essential to my ruling, I also note that Houston's *prima facie* showing fails because he has not shown an "adverse employment action" within the meaning of CEPA. *See Farneski v. County of Hunterdon*, Civ. No. 09-4769, 2013 WL 86001, at *13 (D.N.J. Jan. 9, 2013) (quoting *Klein v. Univ. of Med. & Dentistry of N.J.*, 377 N.J. Super. 28, 46, 871 A.2d 681, 692 (2005)); *Cardenas v. Massey*, 269 F.3d 251, 267 n.10 (3d Cir. 2001) (a "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). Here, the employment action was Houston's ceasing to be an RIC trainer; that was Houston's, not Chief McAndrew's, decision. Chief McAndrew's suggestion that Houston take a break from the Department did not affect Houston's benefits or membership status in the Department.

And even if Houston could make such a threshold showing, he would face another barrier: the Township has articulated a legitimate, non-discriminatory reason for his suspension. As in *Massarano*, "even if the plaintiff had established a prima facie case for retaliation under CEPA-which [he] has not-[he] has not met [his] burden to show that the stated reasons for his [suggested suspension] were pretextual." *Massarano*, 400 N.J. Super. at 492, 948 A.2d at 664. In *Massarano*, the employer had legitimate reasons for discharging the plaintiff because of her obstructionist, disloyal, and insubordinate statements and attitude. *Id.* These are the same reasons Chief McAndrew cited for his suggestion that Houston step back from his involvement in the Department. This would at least shift the burden of proof back to Houston.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment is **GRANTED**. An appropriate order follows.

KEVIN MCNULTY
United States District Judge

Dated: March 21, 2013